The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: May 19, 2022

**NO. S-1-SC-36918**

**ALFREDO MORGA, Individually**
**and on behalf of the Estate of**
**YLAIRAM MORGA, Deceased,**
**and as Next Friend of**
**YAHIR MORGA, Minor Child;**
**and RENE VENEGAS LOPEZ,**
**Individually and as the Administrator**
**of the Estate of MARIALY RUBY**
**VENEGAS MORGA, Deceased, and**
**GEORGINA LETICIA VENEGAS, Individually,**

Plaintiffs-Respondents,

v.

**FEDEX GROUND PACKAGE SYSTEM, INC.,**
**RUBEN'S TRUCKING, LLC a/k/a**
**RUBEN REYES a/k/a SHOOTER'S EXPRESS**
**TRUCKING, INC., the Estate of ELIZABETH**
**SENA QUINTANA, and M&K'S TRUCKING, INC.,**

Defendants-Petitioners.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Francis J. Mathew, District Judge**

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward R. Ricco

Jeffrey M. Croasdell
Jocelyn C. Drennan
Brenda M. Saiz
Albuquerque, NM

Goodwin Procter LLP
William M. Jay
Washington, DC

for Petitioners

Cervantes Law Firm, P.C.
K. Joseph Cervantes
Las Cruces, NM

Scherr & Legate, PLLC
James Franklin Scherr
Sam Jackson Legate
El Paso, TX

L. Helen Bennett, P.C.
Linda Helen Bennett
Albuquerque, NM

Daniel Anchondo
El Paso, TX

for Respondents

Jarmie & Rogers, P.C.
Mark Standridge
Las Cruces, NM

for Amicus Curiae
New Mexico Defense Lawyers Association

Butt, Thornton & Baehr, P.C.
Monica R. Garcia
Rheba Rutkowski
Albuquerque, NM

for Amicus Curiae
Trucking Industry Defense Association

**OPINION**

**VARGAS, Justice.**

{1}     This case highlights the respective roles that the district court judge and the jury each serve in the inherently difficult task of awarding monetary damages for nonmonetary injuries. The jury awarded four Plaintiffs a total of more than $165 million in damages to compensate them for a tragic accident that claimed half of a young family in a single instant and left surviving family members physically and emotionally injured. Defendants appealed the verdict as excessive, contending it was not supported by substantial evidence and was tainted by passion or prejudice. The Court of Appeals affirmed the verdict. *Morga v. FedEx Ground Package Sys., Inc.*, 2018-NMCA-039, ¶ 1, 420 P.3d 586. We granted certiorari to consider whether the Court of Appeals erred by (1) applying an abuse of discretion standard to review the district court's denial of Defendants' motion for a new trial because the ruling was made by a successor judge who did not oversee the trial, and (2) affirming the district court's denial of Defendants' motion for a new trial on grounds that the verdict was excessive. We conclude that the Court of Appeals did not err in either respect. First, because we review claims of excessive verdicts de novo, we need not adopt a new standard of review for decisions of successor judges assigned under the circumstances of this case, as requested by Defendants, and we decline to do so.

Next, we conclude under our current law that substantial evidence supported the verdict and the record does not reflect that the verdict was tainted by passion or prejudice. We therefore affirm the Court of Appeals.

**I.      BACKGROUND**

{2}      The facts of this case are nothing short of tragic. In the predawn hours of June 22, 2011, a semi-truck hauling double trailers crashed at high-speed into the back of a small pickup truck driven by Marialy Morga. The semi-truck was operated by FedEx Ground Package System, Inc. (FedEx) and driven by Elizabeth Quintana, who was employed by independent contractors of FedEx (collectively, Defendants).

{3}      At the time of the accident, Marialy had her flashers on and was either stopped or moving very slowly traveling west in the right-hand lane. A witness to the accident testified that he watched as the FedEx semi-truck came upon Marialy's pickup truck without slowing down or taking any evasive action. He explained that

> [i]t seemed that the driver of the FedEx truck never saw the [pickup] truck. It just overtook it. On impact . . . the double trailers in the back, the back trailer bucked, moved up, and they buckled and folded forward. The cab of the FedEx truck collapsed in on itself on top of the small truck,

demolishing the pickup truck and creating a black cloud that enveloped the entire scene. The FedEx semi-truck was traveling at sixty-five-miles per hour when it hit the pickup truck. The record indicates Elizabeth Quintana was distracted when she

hit the pickup truck, did not attempt to brake prior to the collision, and simply ran right over the pickup truck, causing an "extremely severe impact" that "absolutely destroyed" it.

**{4}** The impact claimed the lives of Elizabeth Quintana, twenty-two-year-old Marialy, and her four-year-old daughter Ylairam. Marialy's toddler son Yahir survived but was critically injured.

**A.     District Court Proceedings**

**{5}** Alfredo Morga, individually, as personal representative of Ylairam, and as next friend of Yahir, filed suit against Defendants seeking damages including those for Ylairam's wrongful death, Yahir's physical injuries, and Mr. Morga's own emotional and physical injuries and loss of consortium of his wife and daughter. Marialy's father, Rene Venegas Lopez, brought suit for Marialy's wrongful death as personal representative of her estate.[1] Plaintiffs sought compensatory damages, including noneconomic damages, and punitive damages for their injuries and Marialy's and Ylairam's wrongful deaths.

**{6}** At the close of the evidence, the jury was instructed to consider economic damages in the form of funeral and burial costs, lost value of household services and

---

[1]Alfredo Morga and Rene Venegas Lopez are referred to collectively as "Plaintiffs."

3

earning capacity considering their respective "health, habits, and life expectanc[ies]" for the loss of Ylarim and Marialy, as well as noneconomic damages for the value of their lives "apart from . . . earning capacity" and the loss of parental guidance and counseling from Marialy to her son, Yahir. With respect to damages to Alfredo and Yahir, the jury was instructed to consider economic damages for "medical care, treatment and services received and the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future[, t]he nature, extent and duration of the injury," and any exacerbation of a prior injury. In awarding noneconomic damages, the jury was also instructed to consider the past and future pain and suffering,[2] loss of enjoyment of life, and emotional distress suffered as a result of the accident.

{7}     The district court directed the jury that in determining the amount awarded, there was no fixed method of valuing noneconomic damages including pain and suffering or loss of enjoyment of life, and that jurors were to use "the enlightened

_____

[2]Pain and suffering as an element of noneconomic damages was limited to the claims raised by Alfredo and Yahir. Because Defendants' expert testified that death for both Marialy and Ylairam was instantaneous and Plaintiffs did not present evidence that there was a period of pain and suffering between the time of impact and death, the district court dismissed Plaintiff's claims for pain and suffering for Marialy and Ylairam.

conscience of impartial jurors acting under the sanctity of [their] oath to compensate the beneficiaries with fairness to all parties to this action." The jury was further cautioned in multiple instructions that the verdict must be based on the evidence presented and that "sympathy or prejudice for or against a party should not affect [the] verdict and [was] not a proper basis for determining damages."

{8} The jury entered its verdict, awarding damages totaling $61,000,000 for the wrongful death of Ylairam Morga, $32,000,000 for the wrongful death of Marialy Morga, $32,000,000 for the personal injury to Yahir Morga, $40,125,000 for the personal injury to Alfredo Morga, $208,000 for the damages suffered by Rene Venegas, and $200,000 for the damages suffered by Georgina Venegas.[3]

{9} Following the entry of the verdict, the district court judge recused herself after participating in an ex-parte communication with Plaintiffs' counsel. A successor judge was appointed pursuant to Rule 1-063 NMRA.

{10} Defendants timely filed a motion for a new trial or remittitur[4] on the ground that the verdict was excessive, arguing that it was not supported by substantial

_____

[3]The claims of Mr. Venegas and Ms. Venegas, the parents of Marialy Morga, were settled while this case was pending before the Court of Appeals and are not at issue here.

[4]Defendants did not request the relief of remittitur on appeal, nor did they rebut Plaintiffs' claim of abandonment in their reply brief or request it of this Court at oral argument. Therefore, we conclude that Defendants' remittitur argument has

5

evidence and was tainted by passion or prejudice. The successor judge heard argument on this motion and ultimately denied the motion, finding that substantial evidence supported the verdict and that the verdict was not tainted by passion or prejudice. Defendants appealed to the Court of Appeals.

**B.      The Decision of the Court of Appeals**

{11}     Applying an abuse of discretion standard, the Court of Appeals affirmed the verdict and the successor judge's denial of a new trial or remittitur, concluding that the verdict was supported by substantial evidence and was not tainted by passion or prejudice. *Morga*, 2018-NMCA-039, ¶¶ 1, 25, 37, 52. The Court of Appeals rejected Defendants' invitation to apply a de novo standard of review to the successor judge's decision and emphasized the value New Mexico's judiciary places on juries and district courts to determine the value of human life. *See id.* ¶¶ 10, 25. While the Court of Appeals applied an abuse of discretion standard of review to the successor judge's decision to deny Defendants' motion for a new trial or remittitur, it acknowledged that "even when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo." *Id.* ¶ 8.

---

been abandoned, and we will not address it. *City of Sunland Park v. Santa Teresa Servs. Co.*, 2003-NMCA-106, ¶ 81, 134 N.M. 243, 75 P.3d 843 (explaining that arguments raised below but not on appeal are deemed abandoned); *State v. Aragon*, 1990-NMCA-001, ¶ 2, 109 N.M. 632, 788 P.2d 932 (providing that issues not briefed on appeal are deemed abandoned).

6

{12} The Court of Appeals set forth all of the compensatory damage evidence individually for each Plaintiff and held that substantial evidence supported the verdict, *id.* ¶¶ 14-23, concluding that Defendants did not "identif[y] any of Plaintiffs' evidence deemed insufficient to support the jury's award of non-economic damages" or explain the "type of additional evidence . . . necessary to support such an award." *Id.* ¶ 29. The Court of Appeals also found that Defendants failed to meet their burden to show that passion, prejudice, sympathy, or mistake affected the verdict, concluding that none of the instances Defendants pointed to were sufficient to make such an inference. *Id.* ¶¶ 32, 46. Upon petition by Defendants, this Court granted certiorari.

## II. DISCUSSION

### A. Defendants Are Not Entitled To a De Novo Standard of Review on Their Motion for a New Trial

{13} Under the circumstances of this case, Defendants encourage us to deviate from our long-standing practice of reviewing denials of motions for a new trial under an abuse of discretion standard. Defendants instead contend that because the successor judge did not oversee the trial, his denial of their motion for a new trial should be reviewed de novo. Defendants argue that the decision of a successor judge is not entitled to the deference incorporated into a review for an abuse of discretion. Rather, Defendants reason, such deference should be reserved for the judge who participated

in the trial and had the opportunity to observe the witnesses and the jury. Defendants ask us to instead adopt a de novo standard of review for decisions of a successor judge, and contend that under this standard the verdict here is excessive. We disagree, and decline to adopt a different standard of review here.

**{14}** Defendants' standard of review argument misunderstands the application of the existing standards to this case. "The district court has broad discretion in granting or denying a motion for new trial, and such an order will not be reversed absent clear and manifest abuse of that discretion." *Saenz v. Ranack Constructors, Inc.*, 2018-NMSC-032, ¶ 19, 420 P.3d 576 (internal quotation marks and citation omitted); *see also Sandoval v. Baker Hughes Oilfield Operations*, *Inc.*, 2009-NMCA-095, ¶ 13, 146 N.M. 853, 215 P.3d 791 ("[T]he denial of a motion for a new trial or remittitur is [reviewed for an] abuse of discretion."). An abuse of discretion occurs when the lower court's decision is contrary to law, logic, or reason. *See Perkins v. Dep't of Hum. Servs.*, 1987-NMCA-148, ¶ 19, 106 N.M. 651, 748 P.2d 24 (providing that the district court abuses its discretion if its decision "has not proceeded in the manner required by law" or "is contrary to logic and reason") (internal quotation marks and citation omitted). And, in the context of a motion for a new trial based on an excessive verdict, a district court abuses its discretion when it fails to exercise its discretion in the first instance "despite the predicate findings and the court's

8

conviction that the award should be reduced," *Sandoval v. Chrysler Corp.*, 1998-NMCA-085, ¶ 12, 125 N.M. 292, 960 P.2d 834, or when it "misapprehends the law or if the decision is not supported by substantial evidence." *Brooks v. Norwest Corp.*, 2004-NMCA-134, ¶ 7, 136 N.M. 599, 103 P.3d 39. "[W]here it is shown . . . that the verdict of the jury on the question of damages is clearly not supported by substantial evidence adduced at the trial of the case, a motion for a new trial should be granted, and not to do so is an abuse of discretion." *Jones v. Pollock*, 1963-NMSC-116, ¶ 12, 72 N.M. 315, 383 P.2d 271. In other words, it is an abuse of discretion to deny a motion for a new trial when the district court finds that substantial evidence does not support the verdict. *See Chrysler Corp.*, 1998-NMCA-085, ¶¶ 1, 11-12 (holding that the district court "abused its discretion in failing to act upon its findings regarding an excessive verdict" when the judge "repeatedly stated that the jury's award of damages shocked the conscious of the court" but denied a motion for remittitur or new trial).

{15} While we review the denial of a motion for a new trial for an abuse of discretion, whether a verdict is excessive is reviewed as a matter of law, *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 49, 127 N.M. 47, 976 P.2d 999, and we review matters of law de novo, "without deference to the district court's legal conclusions." *Primetime Hosp., Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 10,

9

146 N.M. 1, 206 P.3d 112. Only after we have conducted our de novo review and determined whether the jury's verdict was excessive do we consider whether the district court abused its discretion by denying Defendants' motion for a new trial. *See Chrysler Corp.*, 1998-NMCA-085, ¶¶ 11-12 (holding that the district court abused its discretion when it concluded that insufficient evidence supported the damage award but denied the defendant's motion for a new trial). Under the circumstances, we see no reason to deviate from our traditional standard of review for a denial of a motion for a new trial, as our review of the size of the jury's verdict to determine whether it was excessive is de novo.

**B.     The Verdict Is Not Excessive As a Matter of Law**

{16}     Defendants do not contest liability or the economic damages awarded to Plaintiffs in this case. Rather, they claim it is the award of noneconomic damages—those most difficult to assess—that render the verdict excessive and mandate a new trial. *See Chrysler Corp.*, 1998-NMCA-085, ¶ 13 (noting the difficulty in calculating noneconomic damages).

{17}     A new trial is appropriate when "the jury's award of damages is so grossly out of proportion to the injury received as to shock the conscience." *Id*. ¶ 9 (brackets, internal quotation marks, and citation omitted). As we review whether an award shocks the conscience, we do not weigh the evidence but determine whether the

10

verdict is excessive as a matter of law. *See Coates*, 1999-NMSC-013, ¶ 49. The jury's award is excessive if (1) "the evidence, viewed in the light most favorable to [the] plaintiff, [does not] substantially support[] the award," or (2) "there is an indication of passion, prejudice, partiality, sympathy, undue influence[,] or a mistaken measure of damages on the part of the fact finder."[5] *Gonzales v. Gen. Motors Corp.*, 1976-NMCA-065, ¶ 30, 89 N.M. 474, 553 P.2d 1281; *see also Chrysler Corp.*, 1998-NMCA-085, ¶ 9 (same).

{18} As we conduct our de novo review to determine whether the verdict was excessive, we remain mindful of both the inherently difficult task of assigning monetary value to nonmonetary losses and the proper roles that the jury and the district court judge play in making this determination. The valuation of noneconomic damages is an "inexact undertaking at best," and "there can be no standard fixed by law for measuring the value of [noneconomic damages]." *Chrysler Corp.*, 1998-NMCA-085, ¶ 13 (internal quotation marks and citation omitted). Given the difficulty, as well as the lack of a fixed standard, in assessing noneconomic loss, it is well settled that this valuation is left to the jury. *See* Herbert M. Kritzer et al., *An Exploration of "Noneconomic" Damages in Civil Jury Awards*, 55 Wm. & Mary L.

---

[5]For brevity, we refer to this second test simply as "passion or prejudice."

11

Rev. 971, 980 (2014) (explaining that placing monetary value on noneconomic harm "requires human judgment to convert the injury into a monetary sum, typically determined by a jury"); *Baxter v. Gannaway*, 1991-NMCA-120, ¶ 15, 113 N.M. 45, 822 P.2d 1128 (acknowledging that given the lack of a fixed standard the amount awarded "is left to the fact finder's judgment"); *Dimick v. Shiedt*, 293 U.S. 474, 480 (1935) ("[I]n cases where the amount of damages [is] uncertain their assessment [is] a matter so peculiarly within the province of the jury that the Court should not alter it." (internal quotation marks and citation omitted)).

{19}     While it is the jury's role to determine the amount of damages, our case law makes clear that the district court judge and the jury each serve a distinct role in trial proceedings. "It is a fundamental function of a jury to determine damages," and "its verdict is presumed to be correct." *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 16, 127 N.M. 1, 976 P.2d 1 (internal quotation marks and citation omitted). At the same time, a district court judge "is empowered to, with discretion, provide stability and order during the proceedings," keeping in mind that "the judge is a very potent figure, who must not use the position to exert power or influence over the jury." *Id.* The district court judge's "experience with juries in the community provides an indispensable safeguard built into our American civil jury system." *Chrysler Corp.*, 1998-NMCA-085, ¶ 14.

12

> [T]he best way to arrive at a reasonable award of damages is for the [district court] judge and the jury to work together, each diligently performing its respective duty to arrive at a decision that is as fair as humanly possible under the facts and circumstances of a given case.

*Id.* ¶ 16. "When the jury makes a determination and the [district] court approves, the amount awarded in dollars stands in the strongest position known in the law." *Id.* ¶ 14 (internal quotation marks and citation omitted). "The jury must be the exclusive evaluator of the evidence and the credibility of witnesses, with the [district] court only intervening when the jury's verdict is so against the weight of evidence that it would be a grave injustice to allow the verdict to stand." *Rhein v. ADT Auto., Inc.*, 1996-NMSC-066, ¶ 24, 122 N.M. 646, 930 P.2d 783. Taking the respective roles of the judge and jury into consideration, this Court will not disturb a jury's verdict except "in extreme cases." *Martinez v. Teague*, 1981-NMCA-043, ¶ 14, 96 N.M. 446, 631 P.2d 1314.

{20} We recognize that under the circumstances of this case, the collaborative relationship between the district court judge and jury was disrupted by the recusal of the district court judge after the verdict was entered, preventing her from considering Defendants' motion for a new trial. However, Defendants received a thorough review of the record by the successor judge pursuant to Rule 1-063, which allows a successor judge to proceed "upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to

13

the parties." Here, the record reflects the successor judge took more than five months to review the extensive record in this matter. The successor judge explained at the hearing and certified in his order denying Defendants' motion for a new trial, that he had reviewed the pleadings, testimony, and the record. His review was evident from his extensive knowledge of the record and is reflected in his reasoned discussion of the close relationship Marialy shared with her parents, familiarity with objections sustained at trial, and the jurors' responses on the special verdict form. Defendants also received the benefit of the successor judge's experience with juries in the community, *see Chrysler Corp.*, 1998-NMCA-085, ¶ 14 (recognizing a judge's experience with juries in the community as an "indispensable safeguard"), allowing for a complete review of Defendants' motion.

**1.      The verdict is supported by substantial evidence**

{21}    To determine if a verdict is supported by substantial evidence, "[t]he proper approach is to examine [the p]laintiff's evidence related to damages and determine whether that evidence could justify the amount of the verdict." *Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 22. We compare the amount awarded to the injury received and consider whether "the amount awarded is so grossly out of proportion . . . as to shock the conscience." *Lujan v. Reed*, 1967-NMSC-262, ¶ 32, 78 N.M. 556, 434 P.2d 378 (internal quotation marks and citation omitted). We

14

will not disturb the jury's verdict unless "[t]he weight of evidence [is] clearly and palpably contrary to the verdict, and a new trial will only be granted where it is manifest to a reasonable certainty that justice has not been done." *Ruhe v. Abren*, 1857-NMSC-013, ¶ 10, 1 N.M. 247.

{22}    Defendants contend that the $165 million verdict "far exceeds the sum the evidence can support," directing our attention to two circumstances of the verdict to prove their point. First, Defendants claim that the verdict is excessive in comparison to other verdicts, exceeding any prior wrongful death verdict. Second, Defendants argue that the excessive nature of the verdict is evident from the significant disparity between Plaintiffs' proven economic damages and the total award. We are not persuaded.

**a.      We are skeptical of the value of comparing verdicts and reject Defendants' comparisons**

{23}    Arguing that "none of the relevant testimony revealed the existence of non-economic injuries that would be out of the ordinary for a case of this type," Defendants contend that the verdict's "excessiveness is confirmed by the fact that the award exceeds any prior wrongful-death verdict in this state." To support their point, Defendants invite us to compare the jury's award to other verdicts, contending that comparison is helpful to analyze whether a verdict is "supported by the evidence."

{24} To be sure, this Court has previously acknowledged that because "value[s] of all things are arrived at on a relative basis," a comparison of verdicts along with the facts and circumstances of a case is sometimes helpful. *Vivian v. Atchinson, Topeka & Santa Fe Ry. Co.*, 1961-NMSC-093, ¶ 11, 69 N.M. 6, 363 P.2d 620. However, our Court of Appeals has cautioned about the usefulness of such comparisons, noting that they "are not a proper basis for determining either excessiveness or inadequacy of damages . . . because the propriety of the amount of the damages awarded must be determined from the evidence in the case under consideration." *Schrib v. Seidenberg*, 1969-NMCA-078, ¶ 20, 80 N.M. 573, 458 P.2d 825. Indeed, as we noted in *Hanberry v. Fitzgerald*, "there can be no true comparison drawn between this and any other case which has been brought to our attention." 1963-NMSC-100, ¶ 35, 72 N.M. 383, 384 P.2d 256; *see also Maisel v. Wholesome Dairy, Inc.*, 1968-NMCA-038, ¶ 9, 79 N.M. 310, 442 P.2d 800 ("What this court may have done in other cases, or what courts of other jurisdictions may have decided in cases involving similar injuries, is of no consequence." (internal quotation marks and citation omitted)). Because each case must be decided on its own facts and circumstances, judges are not bound by those comparisons. *Vivian*, 1961-NMSC-093, ¶ 11.

{25} In this case, Defendants did not provide the district court or the Court of Appeals with any comparable verdicts and instead relied solely on their assertion

16

that the verdict was the largest in the history of the State "for wrongful death or comparable loss." However, on appeal to this Court, Defendants did provide some verdicts for comparison and at oral argument urged us to compare the verdict in this case to that of *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 2010-NMCA-021, 147 N.M. 720, 228 P.3d 504. A comparison of this case to the *Wachocki* case only highlights why we hesitate to make such comparisons and why each case must be decided on its own facts and circumstances. *See Vivian*, 1961-NMSC-093, ¶ 11 (explaining each case must be decided on its own facts and circumstances). *Wachocki* was not decided by a jury, and the only similarity between this case and the *Wachocki* case is the fact that the decedent there and Marialy Morga were both twenty-two years old at the time of their deaths. *Wachocki*, 2010-NMCA-021, ¶ 3. The *Wachocki* decedent was a single man who lived with his brother and had no dependents. *Id.* ¶ 14. The district court in that case assessed the decedent's damages at $3.7 million, *id.* ¶ 13, as compared to $32 million awarded to the estate of Marialy Morga for her wrongful death. The difficulty in comparing the two cases becomes obvious when one considers that the award to Marialy Morga's estate for her wrongful death included, among other things, the loss of her opportunity to provide parental guidance and counseling to her children and build the life she had planned with her husband, damages that the *Wachocki* decedent did not appear to suffer. This

17

is not to say that the *Wachocki* decedent's life was any less important or valuable. Instead, these differences serve to show the difficulty of comparing verdicts in cases where plaintiffs come to the court in very different circumstances, despite some similarities. The comparison becomes even more problematic when it is extended to the damages awarded to additional Plaintiffs in this case who each suffered their own independent injuries and who share no apparent similarities with the *Wachocki* decedent.

{26} While the combined verdict for the four Plaintiffs in this case may exceed other wrongful death verdicts rendered by New Mexico Courts, we note that at least one New Mexico jury has issued a verdict comparable to the individual verdicts rendered for Plaintiffs. *Hein v. Utility Trailer Mfg. Co.*, D-101-CV-2016-01541, is a wrongful death case involving the death of sixteen-year-old Riley Hein, who, like Marialy and Ylairam Morga, was killed in a trucking accident. *Id.*, Complaint for Wrongful Death and Loss of Consortium (1st Jud. Dist. Ct. June 22, 2016). The *Hein* jury concluded that the damages for Riley's death were $38 million.[6] *Id.*, Special Verdict Form (1st Jud. Dist. Ct. Aug. 23, 2019). That award was more than this jury

---

[6]The jury then apportioned fault between the defendant and a third party.

awarded for the death of Marialy but less than it awarded for the death of Ylairam.[7] Taking all of this into account, we are not convinced that any of the cases Defendants point to offer a meaningful comparison to the case at hand. And Defendants' comparison of the award in this case with the award in *Wachocki* illustrates why we remain "skeptical about the usefulness of comparing awards for [noneconomic damages] in other cases." *Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 18. Rather, the "amount of awards necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation, and in the final analysis, each case must be decided on its own facts and circumstances." *Id*. (brackets, internal quotation marks, and citation omitted).

**b.    We reject Defendants' invitation to compare economic and noneconomic damages to determine whether the verdict is excessive**

{27}    Defendants also point to the disparity between the economic and noneconomic damages awarded to support their claim that the jury's award was excessive. The Court of Appeals rejected Defendants' argument to establish excessive jury verdicts by comparing economic and noneconomic damages,

---

[7]Following the entry of the verdict but before a judgment was entered in the *Hein* matter, the parties resolved all disputes and claims between them and dismissed the case. *Id.*, Stipulated Order of Dismissal with Prejudice (1st Jud. Dist. Ct. Mar. 23, 2020).

referring to such a comparison as a "fixed mathematical formula[]" which is not "the proper basis for reversing a jury's non-economic damage award." *Morga*, 2018-NMCA-039, ¶ 31. Because there is frequently no readily identifiable relationship between economic damages and noneconomic damages, we agree with the Court of Appeals that placing noneconomic damages in a ratio with economic damages is not a proper method for determining whether the verdict is supported by substantial evidence. Doing so fails to account for severe harm that results even absent pecuniary loss.

{28} "Noneconomic damages include pain and suffering, future pain and discomfort, disfigurement, loss of enjoyment of life, mental anguish, and loss of consortium." 63B Am. Jur. 2d *Products Liability* § 1754 (2010) (footnotes omitted). Noneconomic damages also include the value of life itself. *See Romero v. Byers*, 1994-NMSC-031, ¶¶ 4, 25, 117 N.M. 422, 872 P.2d 840 (holding that the value of life itself is a compensable element of noneconomic damages). "By their very nature noneconomic damages are conceptually a contradiction in terms: they provide monetary compensation for an injury that is intangible in monetary terms." Kritzer et al., *supra*, at 975. A person can suffer severe injuries and even lose his or her own life without incurring significant economic loss. *Id.* at 980. "[T]he important substantive and methodological consequence of this observation is that using

20

economic loss as the denominator for assessing noneconomic losses can be very misleading because economic loss does not always capture the severity of the injury in terms of the noneconomic consequences of that injury." *Id.*

{29} Defendants acknowledged that "[t]here is no way to calculate [noneconomic] damage. This should be left up to the trier of fact." Defense counsel stated to the jury in closing argument, "I am not going to submit to you a number, because I agree the value of life—I don't want to insult anybody about the value of life in this case. But you have to rely on your own consciousness [sic] when you're looking at value of life," and "I have a lot of faith in the [j]ury system. I recommend to clients to go to a [j]ury, rely on a [j]ury. And I trust that all of you will look at this evidence and do the right thing."

{30} We recognize that some elements of a plaintiff's economic damages may bear a relationship to a plaintiff's noneconomic harm, but most do not. An award of significant past and future medical expenses to treat a plaintiff's severe injuries may support an equally significant award of noneconomic damages for the plaintiff's pain and suffering. However, in a case such as this one where Marialy Morga and Ylairim Morga did not survive the impact of the accident and therefore did not incur any medical expenses but were deprived of life itself, including all the joys and benefits that accompany it, the relationship becomes more difficult to quantify. The

21

correlation becomes even more problematic when evaluating noneconomic damages for a plaintiff with significant future earning capacity versus one with limited earning capacity. To allow such a relationship would unfairly benefit wealthier plaintiffs and place less value on the pain and suffering, and even on the lives, of those of less wealth. Tethering noneconomic harm to economic damages places a thumb on the scale for wealthier plaintiffs when pecuniary loss is merely one aspect of total injury and does not account for severe nonmonetary harm a plaintiff may suffer.

{31} Indeed, this Court has long held that "recovery [for wrongful death] may be had even though there is no pecuniary injury." *Stang v. Hertz Corp.*, 1970-NMSC-048, ¶ 7, 81 N.M. 348, 467 P.2d 14. While some courts have held that the existence or lack of pecuniary damages is a factor to be considered in placing a dollar amount on a human life, *see Martinez v. Cont'l Tire Americas, LLC*, 476 F. Supp. 3d 1137, 1142 (D.N.M. 2020) ("The presence or absence of pecuniary damages is a factor to be considered in arriving at a monetary figure for the value of the deceased's life." (internal quotation marks and citation omitted)), this Court made clear that "the [Wrongful Death] Act goes beyond the loss of decedent's wages, and encompasses all damages that are fair and just." *Romero*, 1994-NMSC-031, ¶ 19. Thus, "the jury in a wrongful death action [must] determine fair and just compensation for the

reasonably expected nonpecuniary rewards the deceased would have reaped from life as demonstrated by his or her health and habits." *Id.* ¶ 17.

{32} New Mexico law specifically instructs juries to consider noneconomic damages apart from economic losses. *See* UJI 13-1830(4) NMRA (providing a separate line for a jury to award damages "apart from . . . decedent['s] earning capacity"); *see also Gutierrez v. Kent Nowlin Const. Co.*, 1981-NMCA-107, ¶ 16, 99 N.M. 394, 658 P.2d 1121 (citing the jury instruction listing earning capacity as a separate element of damages as support for upholding an award greater than the proven economic damages), *rev'd on other grounds*, *Kent Nowlin Const. Co. v. Gutierrez*, 1982-NMSC-123, ¶ 2, 99 N.M. 389, 658 P.2d 1116. And, "[i]rrespective of exemplary damages," *Folz v. State*, 1990-NMSC-075, ¶ 26, 110 N.M. 457, 797 P.2d 246, "substantial" noneconomic damages are permissible under our Wrongful Death Act (Act) because, in addition to compensation, the Act is also intended "to promote safety of life and limb by making negligence that causes death costly to the wrongdoer." *Stang*, 1970-NMSC-048, ¶¶ 9, 11. In sum, to tie an award of noneconomic damages to Plaintiffs' economic damages, as Defendants propose, is contrary to our existing law and would establish a dangerous policy of, in part, valuing human life based on a person's net worth.

23

{33}	Reviewing this verdict for excessiveness de novo, as we must, we conclude that substantial evidence supports the verdict. Considering all of the evidence in the light most favorable to the verdict, our deference to juries, and our hesitancy to make comparisons between verdicts and between economic and noneconomic damages, this Court cannot say that the weight of the evidence is clearly and palpably against the verdict and that it would be an injustice to let the verdict stand. *See Ruhe*, 1857-NMSC-013, ¶ 10 ("The weight of evidence must be clearly and palpably contrary to the verdict, and a new trial will only be granted where it is manifest to a reasonable certainty that justice has not been done.").

{34}	To support their damages claim, Plaintiffs presented evidence of the deaths of Marialy and Ylairam Morga, as well as the physical and psychological injuries suffered by Alfredo and Yahir Morga resulting from the accident. The evidence showed that Alfredo's epilepsy, which had previously been controlled with medication, was exacerbated and that since the accident he has suffered from PTSD and major depressive disorder and would require psychiatric care. Alfredo testified that after the accident, he could not work for a period of three months and when he did return to work, the effects of the accident interfered with his ability to do his job properly such that he had to leave his job and find another occupation. The evidence presented also showed that Yahir suffered damage to his lungs, a head injury, a

24

lacerated liver, multiple abrasions and contusions, and a broken leg, all requiring future medical treatment.

{35}    In addition to these losses, Plaintiffs also presented evidence of noneconomic losses through photographs and the testimony of Marialy's parents and sister and Alfredo, each of whom described Marialy and Ylairam, the close relationships Alfredo and Yahir had with them, the life they had together, their plans for the future, and the personal loss suffered as a result of their deaths. Alfredo testified about the night of the accident, explaining that when he arrived on the scene, he was warned against approaching the pickup truck where his wife and daughter remained. He testified about going to the hospital in El Paso where his son had been taken after the accident and staying there with his son for several days. Alfredo recounted how he was unable to participate in the planning of Marialy's and Ylairam's funeral services because he was with his son at the hospital.

{36}    Regarding Yahir's mental state, Plaintiffs presented testimony that Yahir may suffer "increased risk for psychological difficulties" in the future as a result of the early loss of his mother and sister. Plaintiffs also presented testimony that Yahir stopped talking after the accident and began waking at night crying for his mother and father.

{37} Of note, Defendants do not attempt to explain why the award for each of the individual Plaintiffs is excessive, but instead argue that the cumulative verdict is excessive. To be sure, the cumulative verdict in favor of the four Plaintiffs is large. However, we cannot say that, viewing the evidence in the light most favorable to Plaintiffs, the individual damages awarded for the deaths of Marialy and Ylairam and the injuries incurred by Alfredo and Yahir are so excessive that "it is manifest to a reasonable certainty that justice has not been done." *Ruhe*, 1857-NMSC-013, ¶ 10. Accordingly, the conscience of this Court is not shocked by the jury's award of damages for the lives of these four Plaintiffs. However, a verdict can be excessive notwithstanding a finding of substantial evidence if it was tainted by passion or prejudice.

**2.      Defendants have not shown that the verdict is a product of passion or prejudice**

{38} Defendants also argue that the verdict was tainted by passion or prejudice, entitling them to a new trial. While Defendants argue that it is "the plaintiffs' burden to submit record evidence sufficient to sustain a verdict," our law is clear that a party appealing the denial of a motion for new trial or remittitur "bears the burden of showing that the record supports its contention that there was error in the verdict." *Coates*, 1999-NMSC-013, ¶ 51. That is to say, it is Defendants who "must show that the verdict (i.e., damage awards) was infected with passion, prejudice, partiality,

26

sympathy, undue influence, or some corrupt cause or motive." *Id.* (internal quotation marks and citation omitted).

{39}     Defendants raise four issues to support their claim that the jury's verdict was infected with passion or prejudice. Defendants first point to the size of the verdict as an indication that passion or prejudice tainted the jury's award. Defendants also point to three aspects of the trial to support their claim. Specifically, they contend that the emotional testimony of Alfredo Morga, an unredacted photograph of the accident scene, and allegedly inflammatory statements made by Plaintiffs' counsel during closing argument "explain the prejudice that motivated the jury's verdict." After reviewing Defendants' claims, we conclude Defendants did not meet their burden to show that the verdict was tainted by passion or prejudice, as we explain next.

**a.     The size of the verdict alone is insufficient to infer passion or prejudice**

{40}     Initially we note that, while the verdict here is undeniably large, the size of a verdict alone is insufficient to infer it was affected by passion or prejudice unless it is "outrageously excessive and beyond all reason." *Henderson v. Dreyfus*, 1919-NMSC-023, ¶ 36, 26 N.M. 541, 191 P. 442; *see also Bodimer v. Ryan's Fam. Steakhouses, Inc.*, 978 S.W.2d 4, 9 (Mo. Ct. App. 1998) ("[T]he amount of verdict by itself is not enough to establish that verdict was result of bias, passion and

prejudice."); *Mather v. Griffin Hosp.*, 540 A.2d 666, 673 (Conn. 1988) ("The size of the verdict alone does not determine whether it is excessive."). In *Henderson*, this Court declined to infer passion and prejudice where the only circumstances relied upon by the defendant were "the size of the verdict" and the fact that in many other similar cases "much smaller verdicts have been returned." 1919-NMSC-023, ¶¶ 49-50. That the court may have awarded a smaller amount than the jury awarded is also insufficient to support disturbing the jury's verdict. *See Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 17 ("[T]he mere fact that a jury's award is possibly larger than the court would have given is not sufficient to disturb a verdict." (internal quotation marks and citation omitted)). "In the absence of an unmistakable indication of passion or prejudice, a reviewing court will not set aside a jury's award of damages unless the amount of the verdict in light of the evidence indicates the jury was influenced by prejudice, passion, or other improper considerations." *Id*. ¶ 20 (internal quotation marks and citation omitted).

{41}     Defendants also contend that we should infer that passion or prejudice affected the jury's award because its verdict was greater than the combined amount of punitive and compensatory damages Plaintiffs' counsel suggested during closing argument. In support of its argument, Defendants first assert that because the combined total compensatory damages awarded to all four Plaintiffs, $165 million,

28

exceeds the $140 million in punitive damages suggested by Plaintiffs[8] we can infer that the award was based on a desire to punish Defendants.

{42} Defendants rely on *Jackson v. Southwestern Public Service Co.* for the proposition that counsel's suggested amount of damages "might have contributed" to a mistaken award when the verdict "was so close to that figure." 1960-NMSC-027, ¶ 69, 66 N.M. 458, 349 P.2d 1029. In *Jackson*, after counsel for the plaintiff suggested the plaintiff's damages for the loss of his leg was $100,000, the jury returned a verdict for $95,000. *Id.* ¶¶ 68-69. To the extent Defendants have argued, quoting *Jackson*, that the verdict here "was so close to" Plaintiffs' suggested punitive award evidencing a mistaken award, we note that here the difference in the suggested punitive damage award and the amount awarded is $25 million, not $5,000. As Plaintiffs pointed out to the successor judge at the post-trial motions hearing, this would have required a $25 million mathematical mistake by the jury.

{43} In concluding that the verdict was not "returned as a result of passion, sympathy, or prejudice on the part of the verdict—or the jury," the successor judge reasoned, "[t]he special verdict form indicates clearly the jur[ors] understood that they were returning a verdict for compensatory damages." Indeed, the special verdict

---

[8]The jury declined to award punitive damages to Plaintiffs.

form makes clear that the jury considered the claims of each Plaintiff individually and awarded each Plaintiff a distinct amount ranging from $200,000 to Marialy Morga's mother Georgina Venegas for her loss of consortium claim to $61 million for the wrongful death claim of the Estate of Ylairam Morga. Additionally, after the jury returned its verdict the district court judge carefully polled the jury to ensure its award was correct. Considering the disparity between the amount of suggested punitive damages and the amount awarded, the clear explanation of the individual amounts awarded to each Plaintiff on the jury's special verdict forms, and the poll of the jury confirming its award was for compensatory damages, we conclude that Defendants have failed to carry their burden to show an unmistakable indication of passion or prejudice, and we decline to infer passion or prejudice affected the verdict based on Plaintiffs' suggested punitive damage award. *See Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 20 (requiring "an unmistakable indication of passion or prejudice" to infer that passion or prejudice affected the verdict (internal quotation marks and citation omitted)).

{44} Defendants next assert that the amount awarded shows prejudice and sympathy because it is greater than what Plaintiffs' counsel suggested for compensatory damages. Defendants contend that Plaintiffs' suggested metric for valuing human life, $500 a day, calculated to about $12 million as Plaintiffs'

30

requested amount of damages for the Estate of Marialy Morga. The Court of Appeals called this a "hypothetical suggestion" offered as "guidance to the jury" and not "a specific amount of monetary damages" requested by Plaintiffs. *Morga*, 2018-NMCA-039, ¶ 33. Even if Plaintiffs' suggested valuation method was their requested amount of damages, our case law is clear that this type of request does not place a limit on the amount of damages a jury may award. *See Nava v. City of Santa Fe*, 2004-NMSC-039, ¶ 18, 136 N.M. 647, 103 P.3d 571 (explaining that a plaintiff's requested damages is not "a ceiling on a jury's award").

{45}     Defendants concede that a plaintiff's request of damages does not act as a legal estoppel or place a cap on the jury's award. However, Defendants assert that it is "a relevant consideration" in determining whether passion or prejudice tainted the verdict. Defendants rely on *Nava*, *id.*, for the proposition that a jury's award of damages in an amount exceeding the sum requested by a plaintiff "indicates that passion or prejudice affected the verdict." *Nava* recognizes that the plaintiff is "in the best position to evaluate the true extent of his or her damages" but also acknowledges that "a plaintiff's request for damages certainly does not create a ceiling on a jury's award." *Id.* We do not find *Nava* particularly helpful, as it was a sexual harassment case involving nonphysical injury to a single plaintiff; it did not ask a jury to calculate noneconomic damages for multiple deaths and serious bodily

31

injury within a single family. *See id.* ¶ 2 (describing plaintiff's allegations of sexual harassment by supervisor and jury's award of $285,000 in damages). While the *Nava* Court held that the amount of the "award in th[at] case was so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice," *id.* ¶ 20 (internal quotation marks and citation omitted), here it is difficult to say the same in light of the deaths of Marialy and Ylairam Morga, the serious injuries to Yahir Morga, and the impact the accident had on the lives of Yahir and Alfredo Morga.

{46}     In *Rhein*, this Court explained that a new trial may be granted "only when there is evidence of jury tampering or other contamination of the process . . . or when the weight of evidence is clearly and palpably contrary to the jury's verdict." 1996-NMSC-066, ¶ 23. The fact that the jury awarded a greater amount than Plaintiffs requested is a far cry from jury tampering or other contamination of the process. Considering the special verdict forms indicating the jurors' understanding of the allocation of the award and considering the lack of any evidence of tampering with the process, the fact that the jury chose to award more than what Plaintiffs may have suggested is insufficient to infer passion or prejudice.

**b.** **None of the three aspects of trial Defendants point to support their claim that the verdict was affected by passion or prejudice**

{47}    Defendants also point to three aspects of the trial that they argue invoked passion or prejudice in the jury. Defendants assert that the testimony of Alfredo Morga, an unredacted photograph of the accident shown to the jury, and purportedly improper statements made by Plaintiffs' counsel during closing argument "inflamed the jury and produced an excessive damages award." Plaintiffs counter that Defendants did not preserve these arguments. Assuming without deciding that the arguments were preserved, we conclude that these three incidents, whether considered on their own or cumulatively, are insufficient to show that the jury's award was the result of passion or prejudice.

**i.** **The testimony of Alfredo Morga did not invoke passion or prejudice in the jury that affected the verdict**

{48}    Defendants contend that Alfredo Morga's emotional testimony—crying when looking at photographs of his wife and daughter, discussing his bond with them and the loss he felt—"even if an unavoidable aspect of the trial, would naturally have affected any person with a sense of compassion." A witness's genuine emotional testimony, alone, however, is insufficient to show passion or prejudice in the jury. *See Caldwell v. Ohio Power Co.*, 710 F. Supp. 194, 199-200 (N.D. Ohio 1989) (noting that involuntary manifestation of emotion is not uncommon in personal

injury cases and holding that mother's genuine emotional testimony was not prejudicial). Generally,

> [an] involuntary manifestation of seemingly genuine emotion by weeping, crying, or similar conduct, during a civil trial, is not ground for a mistrial, reversal, or new trial, in the absence of a resulting prejudicial effect upon the jury, and the decision of the [district] court denying a mistrial or new trial on such grounds will not be disturbed by the appellate court in the absence of an abuse of discretion on the part of the [district] judge.

L. S. Tellier, *Manifestation of Emotion by Party During Civil Trial as Ground for Mistrial, Reversal, or New Trial*, 69 A.L.R.2d 954, § 3[a] (1960).

{49} The record does indicate that Alfredo Morga became tearful multiple times during his testimony on direct examination including while looking at photographs of his family, discussing their close relationship and their plans for a third child, describing arriving at the scene of the accident, and learning his wife and daughter had died and his son had been transported to a hospital in El Paso. The record also reflects that the district court called for two breaks during this testimony and called a bench conference to direct counsel to lead Alfredo Morga through testimony concerning the accident scene to facilitate that examination.

{50} Defendants contend that after the second break, "Mr. Morga was so emotional that he could not continue." However, the record reflects that after the second break, Alfredo Morga retook the stand, and while not devoid of emotion, he was able to

34

complete his testimony, including cross-examination and redirect, without further incident.

{51}    While the record indicates Alfredo Morga cried during his testimony, there is no indication here, and Defendants point this Court to none, of a resulting prejudicial impact on the jury. The record does not reflect that his testimony moved anyone else in the courtroom to tears. Furthermore, the district court acted to curtail the emotional testimony by calling for breaks and directing Plaintiffs' counsel to lead Alfredo Morga through his testimony. Importantly, there is no explanation of the jury's reaction to Alfredo Morga's testimony from which we can conclude undue emotion and sympathy affected its decision. Nothing in the record indicates that Alfredo Morga's testimony tainted the jury's verdict with passion or prejudice. As Defendants admit, this testimony was "honest," "sincere," and necessary. It is difficult to imagine another way for Alfredo Morga to establish his damages outside of offering his testimony as to how he was injured. Likewise, it is predictable and reasonable that a person who lost his wife and young daughter and whose son suffered critical injury all in one accident would be emotional. Alfredo Morga's testimony was the result of genuine emotional response, and nothing in the record indicates any prejudicial reaction from the jury. The testimony appears to fall squarely within the general rule that such genuine emotion is not grounds for a new

35

trial. *See* Tellier, 69 A.L.R.2d 954, § 3[a] (explaining that a display of genuine emotion during a trial is not grounds for a new trial absent "a resulting prejudicial effect upon the jury").

{52}     Defendants concede that there was nothing improper about Alfredo Morga's testimony and rather assert that it was just the emotional nature of his testimony that invoked passion or prejudice in the jury. Defendants rely on *Hanberry*, 1963-NMSC-100, ¶ 33, to support this proposition. *Hanberry*, however, is distinguishable. The *Hanberry* Court did hold that properly admitted evidence may have "the principal effect of unduly stressing the pain and suffering endured by the plaintiff." *Id.* However, the Court was referring to cumulative evidence, specifically pointing to twenty-one photographs of the same injury and reasoning that "[s]uch over-emphasis in proving relatively minor details could very possibly have resulted in causing the jury to ignore the proper measure of damages." *Id.* ¶¶ 12, 33. The *Hanberry* Court did not address the impact of necessary emotional testimony, and we note that Defendants cite no authority that this type of emotional testimony entitles them to a new trial, so we assume none exists. *See State v. Garnenez*, 2015-NMCA-022, ¶¶ 25-26, 344 P.3d 1054 (declining to find that an emotional outburst by a member of the audience in the courtroom tainted the verdict where defendants cited no authority that the emotional outburst required a mistrial); *State v. Guerra*,

2012-NMSC-014, ¶ 21, 278 P.3d 1031 (providing that where no authority is cited we may assume none exists).

{53} On the other hand, there is authority rejecting the argument that necessary emotional testimony entitles Defendants to a new trial. Our Court of Appeals rejected similar arguments made by the defendants in *Maisel*, 1968-NMCA-038, ¶ 11. The *Maisel* defendants argued that passion and prejudice were "obvious" because the plaintiff was divorced and disabled and cared for her disabled daughter. *Id.* The Court reasoned that "[i]nstead of being 'obvious,' there is no indication that these facts caused a verdict based on sympathy" and noted that "the jury was specifically instructed (a) that sympathy for an injured person was not a proper basis for determining damages and (b) that neither sympathy nor prejudice should influence the jury's verdict." *Id.*

{54} Similarly here, the nature of the case does not make it obvious that passion or prejudice affected the jury's verdict. Furthermore, as in *Maisel*, the jury here was specifically instructed with regard to each Plaintiff that it must not allow "sympathy or prejudice" to influence its verdict. Each instruction delineated that "your verdict must be based upon proof and not upon speculation, guess or conjecture." Concerning the Estates of Ylairam and Marialy Morga, the jury was instructed for each that "[y]ou must not permit the amount of damages to be influenced by

37

sympathy or prejudice, or by the grief or sorrow of the family, or the loss of the deceased's society to family"; that "the property or wealth of the beneficiaries or of . . . [D]efendant[s] is not a legitimate factor for your consideration"; and that "the guide for you to follow in determining fair and just damages is the enlightened conscience of impartial jurors acting under the sanctity of your oath to compensate the beneficiaries with fairness to all parties to this action." Defendants acknowledged the significance of these instructions during closing argument, stating that the "instruction is so important, it shows up seven times in the packet of instructions. What it says is that sympathy cannot affect your decision in this case." We assume the jury followed these instructions. *Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 59 ("[W]e presume jurors abide by the court's instructions.").

{55} Moreover, if this Court were to adopt Defendants' suggested inference of passion or prejudice, then in all wrongful death and personal injury claims in New Mexico where a plaintiff exhibiting genuine emotion testifies as to the injury suffered, passion or prejudice would always be inferred in the jury's verdict. Considering the ubiquity and frequently the necessity of this type of testimony, adopting Defendants' proposed inference here would create an unwanted, consistent invasion of the province of the jury in New Mexico. Therefore, we decline to hold that Alfredo Morga's emotional testimony tainted the verdict.

38

**ii.    The unredacted photograph was not so graphic as to arouse the prejudice or passion of the jury**

{56}    The district court entered an order excluding "any graphic photographs of the bodies of Marialy Morga, Ylairam Morga, and Elizabeth Quintana." During closing arguments, Plaintiffs' counsel displayed a photograph to the jury showing the wreckage. The image is clearly of a badly wrecked vehicle. A severely damaged seat and car door are identifiable. Upon close examination, some orange fabric and what appears to be an arm from the shoulder to just below the elbow is visible between the car door and seat. Several scratches and bruises are visible on the arm. The district court ruled that Plaintiffs were permitted to use the photograph but that the portion of the photograph showing the arm should be masked. The masking, however, apparently fell off prior to the presentation of the photograph to the jury. Defendants contend that the photograph likely invoked passion or prejudice and that "[t]his graphic view of [Marialy's] body in the mangled remains of her vehicle likely colored the jury's deliberations" and that we "should conclude . . . that Plaintiffs' use of th[e] prohibited image . . . contributed to the passion and prejudice that invalidate the jury's verdict."

{57}    When Defendants first raised the matter on the last day of the trial following the completion of Plaintiffs' closing argument, the district court acknowledged that the photograph should have been redacted and ordered that the photograph be

39

withheld from the jury for deliberations. At the same time, the district court judge stated that she "seriously doubt[ed]" the jury would recognize the image in the photograph as an arm and that she would not have recognized it as such had it not been pointed out to her. Defendants acknowledge that the district court considered the photograph harmless.

{58} We agree with the district court's assessment. In reviewing the photograph at issue, we see nothing obviously graphic about the image. The photograph focuses on an extremely damaged vehicle and predominately depicts bent and mangled metal, broken glass, a torn car seat, and damaged plastic from the interior of the vehicle. The portion of the photograph showing the arm is small in comparison to the rest of the photograph, and there is nothing gruesome about that section of the photograph. While, upon close examination, some bruises and scrapes are visible, the photograph does not show blood or other physical damage to the arm.

{59} "The [district] court ought to exclude photographs which are calculated to arouse the prejudices and passions of the jury and which are not reasonably relevant to the issues of the case." *State v. Boeglin*, 1987-NMSC-002, ¶ 21, 105 N.M. 247, 731 P.2d 943. However, the photograph that is the subject of Defendants' argument is not so graphic as to fit into the category of photographs that should be excluded as contemplated by this Court's decision in *Boeglin*. Indeed, while Defendants cite

no case law supporting their claim that a photograph of the nature of the one at issue invokes the jury's passion or prejudice, we note that we have affirmed the admissibility of photographs significantly more graphic than the photograph at issue here. *See State v. Galindo*, 2018-NMSC-021, ¶ 39, 415 P.3d 494 (upholding the district court's admission of photographs of a deceased infant, notwithstanding that they were "graphic, heartbreaking, and difficult to view"); *State v. Saiz*, 2008-NMSC-048, ¶¶ 52, 54, 144 N.M. 663, 191 P.3d 521 (affirming the admission of graphic photographs of the victim's decomposed body), *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783; *State v. Mora*, 1997-NMSC-060, ¶¶ 54-55, 124 N.M. 346, 950 P.2d 789 (affirming admission of autopsy photographs of a child victim), *abrogated on other grounds by State v. Frazier*, 2007-NMSC-032, ¶ 1, 142 N.M. 120, 164 P.3d 1. Because the photograph here was not obviously graphic and the district court limited the jury's ability to review it, we conclude upon de novo review that the jury's limited viewing of the photograph is insufficient to infer that the jury's verdict was the result of passion or prejudice.

41

### iii. Statements in closing argument were not so flagrant as to leave all bounds of ethical conduct and any potential prejudice was rectified by the jury instructions

{60} During closing argument, Plaintiffs' counsel argued that Defendant FedEx placed blame on its contractors and "took no responsibility, just like they haven't in this entire trial." Defendants contend that Plaintiffs' counsel's statements in closing arguments suggesting FedEx was trying to pass responsibility to its contractors were "inaccurate and irrelevant." These purportedly improper statements, Defendants contend, prejudiced the jury such that a new trial is required. Defendants concede that they "did not object to Plaintiffs' improper argument" but contend that objection was not necessary because the conduct of Plaintiffs' counsel was egregious. *See Griego v. Conwell*, 1950-NMSC-047, ¶ 17, 54 N.M. 287, 222 P.2d 606 (providing an exception for unpreserved objections to conduct of opposing counsel where counsel goes "outside the record, or . . . attempt[s] to inflame the minds of the jurors against the opposing litigant"). We do not find Plaintiffs' counsel's statements sufficiently egregious to infer that passion or prejudice affected the jury's verdict under the heightened standard of egregiousness set out in *Griego*.

{61} Defendants contend Plaintiffs' argument was improper because Defendant FedEx had agreed to accept responsibility collectively for all Defendants for all damages awarded, including punitive damages. Plaintiffs respond that it was not

42

clear that Defendant FedEx agreed to accept liability, including punitive damages, for all Defendants prior to trial because Defendants only support for this contention occurred after trial began.

{62} Prior to trial, the district court did grant partial summary judgment for Plaintiffs, finding that Defendant FedEx was liable for the actions of its subcontractor driver, Elizabeth Quintana, under the statutory employee doctrine. Although the record reflects some confusion around when Defendant FedEx stipulated to its responsibility for all damages awarded against any Defendants, including punitive damages, the record indicates that on the second day of trial Defendant FedEx agreed to accept this responsibility. While it is not clear why Plaintiffs brought this up again in closing, Defendants themselves brought this issue up again after Plaintiffs rested, asking the district court to find no vicarious liability for punitive damages:

> THE COURT: I'm sorry, but Ms. Saiz already agreed. If punitive damages are awarded, [FedEx] would be liable. You're not getting out of that one. You're not going to be allowed to go back on it.
>
> MR. CROASDELL: I was—I was referring to punitive damages for the conduct—the alleged conduct of Elizabeth Quintana.
>
> THE COURT: I don't care who it's of. She already agreed that—
>
> MR. CROASDELL: I understand.

43

{63} Plaintiffs also point to the special verdict form that required the jury to allocate fault to each Defendant. Defense counsel argued, "when you get to the Special Verdict Form . . . you're going to be asked to decide whether or not FedEx, [its contractors], or Ms. Quintana was negligent in this collision." Plaintiffs' counsel in rebuttal stated, "[p]ut it on the little guy. Do you think they have anything? No. 'Put it on them. It's not our fault. It's just our name, just looks like us.' But that's what they're used to, that's been their whole strategy in this case." Clearly, both parties lacked certainty throughout the trial about the degree of liability Defendant FedEx agreed to assume, and this uncertainty supports a conclusion that the statements made by Plaintiffs' counsel were neither inflammatory nor so egregious as to "leave the bounds of ethical conduct." *Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 57 (internal quotation marks and citation omitted).

{64} Generally, absent objection at trial, we will not grant a new trial based on improper statements of counsel "unless we are satisfied that the argument presented to the jury was so flagrant and glaring in fault and wrongdoing as to leave the bounds of ethical conduct, such as going outside the record." *Id*. (internal quotation marks and citation omitted).

{65} Here, the statements made, while unnecessary given the stipulation from Defendants, were not "so flagrant and glaring" as to leave all bounds of ethical

44

conduct. *Id.* We conclude that the statements here were not inflammatory and that any potential prejudicial effect the closing argument here may have had on the jury was offset by the district court's instruction to the jury that closing arguments of counsel are not evidence. *See* UJI 13-2007 NMRA (providing that neither closing arguments "nor any other remarks or arguments of the attorneys made during the course of the trial are to be considered by you as evidence"); *Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 59 ("[W]e presume jurors abide by the court's instructions."). Therefore, we decline to hold that Plaintiffs' closing argument affected the verdict by inflaming the passion or prejudice of the jury.

**iv.     The cumulative impact of the three aspects of trial did not taint the jury's verdict**

{66}     In reviewing the cumulative effect of these three aspects of trial, we conclude the effect is insufficient to infer that passion or prejudice tainted the jury's verdict. Before the district court, Defendants conceded, "[o]n the big picture, we can't find an error that would justify in its own terms a new trial." The district court maintained tight control of these proceedings. The district court limited evidence offered by Plaintiffs, including certain hospital bills and portions of Alfredo and Yahir Morga's life plans. It also carefully controlled emotional testimony by removing from the jury's view photographs that provoked emotional responses from witnesses, taking breaks during emotional testimony, instructing Plaintiffs' counsel to lead Alfredo

45

Morga through his direct examination, and directing counsel to move on from emotion-provoking testimony. The jury was repeatedly instructed not to allow sympathy to play a part in the determination of its award, and we presume that a jury follows the instructions given by the district court. *Id*. Indeed, the jury's careful allocation of fault to each Defendant, as well as its allocation of five percent fault to Marialy Morga, after Plaintiffs' closing argument urging the jury to allocate no fault to her, indicates a deliberate, thoughtful, and even-keeled verdict.

{67}   We conclude that the careful manner in which the district court judge conducted the trial, in addition to the jury instructions, alleviated any cumulative prejudicial impact of Alfredo Morga's emotional testimony, the inadvertently disclosed photograph, and Plaintiffs' counsel's statements about Defendants' intent to shift the blame. *See United States v. Evans*, 542 F.2d 805, 816 (10th Cir. 1976) (refusing to conclude that three disruptive aspects of trial warranted mistrial when "the [district] court did all that was possible to see that these outside matters did not influence the jury"); *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 16 ("The [district court] judge . . . is empowered to, with discretion, provide stability and order during the proceedings."); *Chrysler Corp.*, 1998-NMCA-085, ¶ 16 ("[T]he best way to arrive at a reasonable award of damages is for the [district court] judge and the jury to work together, each diligently performing its respective duty to arrive

46

at a decision that is as fair as humanly possible under the facts and circumstances of a given case."); *cf. Archuleta v. N.M. State Police*, 1989-NMCA-012, ¶¶ 3-4, 108 N.M. 543, 775 P.2d 745 (finding that passion or prejudice tainted the jury's verdict—where a juror overheard that the judge tentatively granted the defendants' motion for a directed verdict, after which the judge reconsidered allowing trial to proceed, and the jury then ruled for the defendants—reasoning that the jury may have found it futile to carefully consider the plaintiff's case).

**III.    CONCLUSION**

{68}    Reviewing excessiveness of the verdict de novo, as we must, we conclude that substantial evidence supported the verdict and that the jury's award was not the result of passion or prejudice. Therefore, it was not an abuse of discretion for the successor judge to deny Defendants' motion for a new trial. Where there is no error below, we will not substitute our judgment for that of the jury. *Lujan*, 1967-NMSC-262, ¶¶ 25, 32. Accordingly, we affirm the Court of Appeals.

{69}    **IT IS SO ORDERED.**

47

_____

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

_____

**C. SHANNON BACON, Chief Justice**

_____

**DAVID K. THOMSON, Justice**

_____

**ERIN B. O'CONNELL, Judge**
**Sitting by designation**